IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

FILED

JUN 1 3 2005

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____DEPUTY

| | |
|---|---|
| J.D. WILLIAMS & CO., INC., d/b/a AMERICAN HOME MORTGAGE & INVESTMENT COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> AMERICAN HOME MORTGAGE INVESTMENT CORP., <br><br> Defendant. | No. CIV-05-525-W |

## ORDER

This matter came on for hearing on the Motion for Temporary Injunction[1] filed by plaintiff J.D. Williams & Co., Inc. d/b/a American Home Mortgage & Investment Company ("Williams"). As Williams and defendant American Home Mortgage Investment Corp. ("AHM") were advised at the close of the hearing, the Court, based upon the evidence presented at the hearing and after consideration of the parties' written submissions, finds Williams is not entitled to the relief he has requested. This Order memorializes the Court's ruling and sets forth in more detail the Court's factual findings and legal conclusions.

1. Williams is an Oklahoma corporation with its principal place of business at 3700 W. Robinson, Norman, Oklahoma. The office site is a red brick building which bears the name "American Home Mortgage & Investment Co." in white letters attached to the brick and printed on the windows. The phrase is printed in regular font with the first three words

---

[1]This action was commenced in the District Court of Cleveland County, Oklahoma, on May 4, 2005, and the Motion for Temporary Injunction was filed that day. On May 11, 2005, defendant American Home Mortgage Investment Corp. removed the matter to this Court, alleging that the Court had subject matter jurisdiction under title 28, section 1331 of the United States Code.

of the phrase significantly larger in size that the last three.

2. Williams was incorporated in 1988 and is engaged in the mortgage finance business. It conducts the majority of its business in the State of Oklahoma, and primarily in central Oklahoma counties.

3. Williams' sole shareholder and president is John Daniel Williams ("D. Williams"). At the present time, Williams employs two individuals in addition to D. Williams: a loan processor, Angie Selzer, and a receptionist, Jennifer Ritter. D. Williams is the sole mortgage loan originator.

4. On March 2, 1994, D. Williams filed a Corporate Trade Name Report with the Oklahoma Secretary of State, which indicated that Williams was doing business under the trade name "American Home Mortgage & Investment Company." The Report described Williams' business as "real estate financing & investments."

5. On June 27, 1996, the Oklahoma Secretary of State issued Williams a Certificate of Transcript that indicated that Williams was doing business as American Home Mortgage & Investment Company.

6. On October 1, 2004, AHM opened an office at 3500 W. Robinson, Norman, Oklahoma. AHM is a residential mortgage lender listed on the New York Stock Exchange and has offices nationwide.

7. AHM has been qualified to do business in Oklahoma since August 10, 1999, and has been doing business in this state since 2000. Its qualification to do business in this state and its Oklahoma supervised lender license were issued to a subsidiary, American Home Mortgage Corp. of New York. AHM has offices located in Oklahoma City, Weatherford and Ardmore, Oklahoma.

8. AHM's office at 3500 W. Robinson is identified by a blue sign reflecting the name "American Home Mortgage" in white letters (uniform in size), a blue and white cubed AHM logo and the names "Cheryl & Gene Jenkins" in blue letters. The logo and the names of the employees and the name "AHM Mortgage," all printed in white, are displayed on various windows and doors.

9. Cheryl Jenkins ("C. Jenkins"), an experienced mortgage broker, is the branch manager at AHM's Norman location. C. Jenkins and her husband, Gene Jenkins, were previously associated with PNC Mortgage and Chase Mortgage at that same location.

10. On December 3, 2004, AHM received a Certificate of Trademark Registration issued by the Oklahoma Secretary of State, which reflected AHM's registration of the trademark "American Home Mortgage."

11. In November 2004, D. Williams and C. Jenkins encountered each other after a college sporting event in Norman and D. Williams inquired about C. Jenkins' use of the name "American Home Mortgage."

12. By letter addressed to C. Jenkins and dated April 1, 2005, D. Williams complained about AHM's use of the trade name "American Home Mortgage." He demanded that C. Jenkins immediately cease using that name in any capacity and requested that AHM's legal department contact him by April 15, 2005. D. Williams received no reply.

13. Thereafter, at D. Williams' direction, legal counsel contacted AHM's counsel by letter dated April 13, 2005, and advised that "the nature of our respective clients' businesses, their addresses, and the identity of names has created considerable confusion to the public." Williams' counsel by letter dated April 28, 2005, advised that Williams was

not interested in selling its trade name for a nominal amount and that AHM should "immediately cease and desist using the name 'American Home Mortgage' in the State of Oklahoma."

14. Williams advertises under the names "American Home Mortgage" and "American Home Mortgage & Investments" in the business pages of the telephone book published by Southwestern Bell Company and under the name "American Home Mortgage" in the yellow pages of that same publication.

15. Williams also advertises in the Norman Area (Lexington, Noble, Norman, Purcell and Washington), Moore and South Oklahoma City telephone books published by Transwestern Publishing and in the monthly publication, <u>Norman Living</u>. These advertisements contain a picture of the building at 3700 W. Robinson.

16. Williams also maintains a website at "www.700creditscores.com." The website makes no reference to Williams, D. Williams or American Home Mortgage.

17. Williams promotes its business through the sponsorship of community events and through inter alia the use of notepads which bear the American flag and the name "American Home Mortgage & Investment Company" and through the distribution of D. Williams' business cards, which also bear an American flag and the name "American Home Mortgage & Investment Company" as well as the name "Dan Williams." In 2001 and 2002, Williams also advertised on bus-stop billboards.

18. Williams' reported advertising costs ranged from $9063.00 in 1999 to $14,790.00 in 2003.

19. AHM likewise advertises in community publications. Advertisements in local magazines such as <u>SoonerU</u> and <u>Oklahoma City Downtown</u> show the cubed AHM logo,

the name "American Home Mortgage," the phrase "Mortgages by Cheryl and Gene Jenkins, Norman's #1 Lenders" and the Jenkinses' pictures.

20. In December 2004, C. Jenkins mailed postcards to members of the community. One side read "Hello Our New Name is American Home Mortgage" and bore the cubed AHM logo; the reverse side displayed a picture of C. Jenkins and indicated that she was now associated with AHM Mortgage and the district manager of American Home Mortgage.

21. Both brick-front office sites are visible from the intersection of 36th Street and Robinson, one to the left and one to the right on Robinson.

22. Williams has experienced interruption in, and interference with, its daily business operations due to the receipt of facsimile transmissions and mail addressed to AHM, packages destined for AHM misdelivered by services such as Federal Express and UPS and telephone calls by individuals attempting to contact C. Jenkins and other AHM employees. Misdirected facsimile transmissions, including those from title companies, have been received three (3) to five (5) times since October 2004. Ritter reported that packages have been misdelivered approximately two (2) to three (3) times per week since January 2005 and Ritter and Selzer reported that telephone calls for AHM employees occur two (2) to five (5) times a day. Ritter also indicated that two AHM employees had reported that AHM had been receiving telephone calls from individuals looking for Williams.

23. Carrie McConnell, a sales associate employed by McConnell Realty, upon discovering AHM's office site, asked D. Williams whether Williams had merged with AHM. She believes the similarity and proximity of the two businesses create confusion in the marketplace and that she associates the name "American Home Mortgage" with D. Williams.

24. Donald F. Garms, Jr., a mortgage originator employed by First American Bank, competes with Williams and AHM for business. While he associates the name "American Home Mortgage" with Williams, the use of the trade name by both Williams and AHM does not confuse him, but nevertheless could confuse the public.

25. Leon Rinehart, an individual who has conducted business with Williams, upon seeing AHM's advertisement in a locally-published magazine, inquired whether Williams had moved or sold its business.

26. Tom McAuliffe, the managing broker of Don Cies Real Estate, Inc., by written declaration reported

(A) that he has been active in the real estate industry since 1983;

(B) that he is well acquainted with the residential lending business in the Norman area and with the reputation of both C. Jenkins and D. Williams;

(C) that he has referred business to C. Jenkins since 1986 or 1987, and continues to do so; and

(D) that he does not refer business to D. Williams.

Declaration of Tom McAuliffe (June 2, 2005).

27. By declaration filed of record, David L. Dustmann reported

(A) that in August or September 1997, he was employed as branch manager of American Home Loans ("AHL") in Norman;

(B) that shortly thereafter he was contacted by D. Williams who demanded that AHL cease doing business under that name;

(C) that in November 2001, he began doing business as American Home Lenders in Norman; and

(D) that D. Williams has never contacted him about use of the name "American Home Lenders."

Declaration of David L. Dustmann (June 2, 2005).

28. During April and May 2005, Williams was processing approximately five (5) to ten (10) loan applications. During this same time, AHM was processing approximately fifty (50) loan applications.

29. In the Norman area, approximately seventy (70) entities compete for the mortgage financing business.

30. Multiple entities in the relevant market conduct business under names containing the words and phrases "American," "American Home" and "American Home Mortgage."

In its state court petition, Williams asserted claims for relief under the Oklahoma Deceptive Trade Practices Act ("DTPA" or "Oklahoma Act"), 78 O.S. § 51 et seq., and under the Lanham Act, 15 U.S.C. § 1051 et seq. Williams also asserted common law claims based upon interference with business relations and unfair competition.

It alleged in its petition that AHM

> "uses the name American Home Mortgage in states such as Oklahoma with the express knowledge that other mortgage brokerage businesses such as [Williams] . . . have the right to that trade name and with the intent to use its superior economic strength to cause businesses such as [Williams] . . . to sell the right to use the name American Home Mortgage to [AHM] . . . after [AHM] . . . starts a competitive business utilizing the same trade name."

Petition at 4, ¶ 14.

In connection with its cause of action under the DTPA, Williams prayed for a temporary injunction to issue

"restraining and enjoining [AHM] . . . and its servants, agents and employees from doing business as 'American Home Mortgage' in the State of Oklahoma and particularly in the counties of Cleveland, Oklahoma, McClain, Tulsa and Grady, State of Oklahoma, from advertising directly or indirectly under such trade name 'American Home Mortgage,' or from using such name in any manner that is deceptively similar to [Williams'] . . . corporate or trade name, and in particular from using the name 'American Home Mortgage' in connection with the mortgage brokerage business in the State of Oklahoma and the counties set forth herein."

Id. at 6, ¶ 2. See Motion for Motion for Temporary Injunction (May 4, 2005).

In Oklahoma, courts weigh four factors in determining whether a party is entitled to injunctive relief: (1) the likelihood of that party's success on the merits; (2) the irreparable harm to that party if injunctive relief is denied; (3) the relative effect of the relief, if granted, on the opposing party; and (4) the effect of the relief upon public policy and interests. E.g., Tulsa Order of Police Lodge No. 93 v. City of Tulsa, 39 P.3d 152, 158 (Okla. App. 2001).

Williams has asserted in its written submissions that the DTPA arguably does not require proof of irreparable injury. In this regard, the Oklahoma Act provides that

"[e]vidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition,"

78 O.S. § 53(B), and that

"[a]ny person damaged or likely to be damaged by a deceptive trade practice of another may maintain an action . . . to prevent, restrain or enjoin such deceptive trade practice. Proof of actual monetary damages, loss of profits or intent shall not be required. . . ."

Id. § 54(A).

Admittedly, upon a showing as a matter of law of a deceptive trade practice, the aggrieved party would be entitled to permanent injunctive relief even in the absence of proof of actual monetary damages or loss of profits. Oklahoma law supports this

proposition. E.g., Central Plastics Co. v. Goodson, 537 P.2d 330 (Okla. 1975). The Oklahoma Supreme Court however has never indicated that a showing of irreparable harm is not required for a preliminary injunction to issue under the DTPA. Thus, the Court must examine the foregoing factors to determine whether Williams is entitled to the relief it has requested.

The DTPA defines a "trade name" as

"a word, name, symbol, device, or any combination of the foregoing in any form of arrangement used by a person to identify his business, vocation, or occupation and to distinguish it from the business, vocation, or occupation of others."

78 O.S. § 52(10). A trade name "denotes a business or company and its good will," 1 McCarthy on Trademarks and Unfair Competition § 4:13 (4th ed. 1998), and it serves the purpose of identifying the individuality of a business. Id. (footnote omitted).

Under the Oklahoma Act, "[a] person engages in a deceptive trade practice when in the course of business, . . . the person . . . [p]asses off goods or services as those of another." 78 O.S. § 53(A)(1). In this connection, Williams has contended that AHM in the course of its business through its use of the trade name "American Home Mortgage" has passed off its mortgage finance services as those services offered by Williams. To ultimately prevail on its claim under the DTPA, Williams is required to prove inter alia that a likelihood of confusion exists between its use of its trade name and the use of the name by AHM.

Relevant factors in determining whether a likelihood of confusion exists includes the degree of similarity in the names used and in the marketing methods employed by the two entities and the strength or weakness of Williams' trade name. E.g., Restatement (Third)

of Unfair Competition § 21 (1995). No one factor is dispositive; a variety of factors including those listed must be considered. Id.

In this connection, although there is a high degree of similarity in the names used (aside and apart from their distinct visual appearances), both Williams and AHM use other terms, including "American Home Mortgage & Investment Company" and "AHM Mortgage," respectively, to market their businesses. Furthermore, AHM promotes its business through the use of the cubed AHM logo and by focusing on the reputation and name recognition of C. Jenkins in the community.

There is likewise a high degree of similarity in the methods utilized by the two entities to reach their target market: homeowners, or potential homeowners, who need mortgage financing. Both Williams and AHM advertise in local publications and are involved in, and promote, community events.

As to the second factor, a trade name is considered strong and entitled to broader protection if it is conspicuously distinctive. If it includes common words, it is considered weak and entitled to much narrower protection. The trade name "American Home Mortgage" is neither unique nor distinctive; the word "American" is only geographically descriptive, and the phrase "Home Mortgage" at most merely describes the services Williams offers.

Descriptive trade names are protectible only if they have acquired a secondary meaning, and under the evidence presented at this stage, the Court finds the name "American Home Mortgage" has not be used so exclusively by Williams that the public uniquely associates that name with Williams or the services it provides.

Accordingly, the Court finds some actual confusion[2] between Williams and AHM has indeed occurred by these two entities' respective use of the trade name "American Home Mortgage" in connection with their mortgage finance business. However, the weakness of Williams' trade name coupled with the fact that the actual confusion appears at this point to be minimal and the fact that the mere possibility of future confusion is not sufficient to establish a likelihood of confusion leads the Court to the conclusion that Williams has failed to adequately show a likelihood of success on the merits of its claim under the DTPA.

Furthermore, to the extent under the DTPA that Williams must demonstrate irreparable injury, the Court finds any claim of such injury is refuted by Williams' delay in seeking relief.

A preliminary injunction is an extraordinary remedy. It is granted under the theory that there is an immediate need for swift action to protect a party's rights. The evidence at this stage belies any claim of imminent irreparable harm.

D. Williams knew as early as October or November 2004 that AHM was using the name "American Home Mortgage." He confronted C. Jenkins about AHM's use only when he unexpectedly encountered her after a sporting event. Williams took no formal action to protect its rights, if any, in the name until April 2005 when D. Williams sent a letter to C.

---

[2]"Actual confusion . . . can . . . be shown through evidence of conduct probative of confusion such as misdirected letters and telephone calls. Evidence of inquiries by customers as to whether the plaintiff and the defendant are associated, however, may not establish the existence of actual confusion if the nature of the inquires indicates that consumers perceive a difference between the designations and are skeptical of the existence of a connection between the users. . . . Proof of only a few instances of actual confusion may also be insufficient to support an inference that a significant number of prospective purchasers are likely to be confused." Restatement (Third) of Unfair Competition § 23, comment c (1995)(citation omitted).

Jenkins, and Williams did not file the instant suit or seek injunctive relief until May 2005. Accordingly, the Court finds Williams did not act diligently in protecting its alleged interests

Furthermore, in this state, irreparable harm is measured by the adequacy of existing and available remedies at law. E.g., Tulsa Order of Police, 39 P.3d at 158. An injury is irreparable if it cannot be fully compensated by money damages or if the amount of damages is so speculative that calculation would be difficult or impossible. Id. at 159.

The Court finds other factors, and not AHM's use of the trade name "American Home Mortgage," may have contributed to a decline, if any, in Williams' business. In any event, mere conjecture about the immediacy and extent of the harm that a party will allegedly suffer in the absence of a preliminary injunction is not sufficient, and the Court finds under the facts and circumstances of this case that any alleged harm suffered or to be suffered by Williams, including injury to its good will and business reputation, as a result of AHM's use of the name "American Home Mortgage" if the injunction does not issue is neither immeasurable nor incapable of being satisfactorily compensated by money damages.

Having determined that Williams has failed to satisfy the first two factors of the four factor test used by state courts, the Court has not considered Williams' arguments and proof with regard to the remaining two factors: the relative effect of the injunctive relief, if granted, on AHM and the effect of that relief upon the public.

In its brief in support of its Motion for Temporary Injunction, Williams also sought preliminary injunctive relief under the Lanham Act, 15 U.S.C. § 1501 et seq. This Act like the DTPA protects trade names, id. § 1125(c)(1), which are statutorily defined under federal law as "any name used by a person to identify his . . . business or vocation." Id. §

1127.

Federal law also requires consideration of the same four factors in deciding whether a preliminary injunction should issue, and because the Court finds the absence of sufficient proof of the first two factors weighs against the issuance of an injunction in this case,[3] it again has not considered Williams' arguments and evidence in connection with the remaining two factors as they pertain to Williams' federal cause of action and the injunctive relief requested pursuant thereto. Id. § 1125(c).

As indicated, the first factor requires Williams to show that it has a substantial likelihood of success on the merits, and because the relevant section of the Lanham Act–15 U.S.C. § 1125(a)(1)[4] –requires the same standard of proof as that required under

---

[3]The United States Court of Appeals for the Tenth Circuit has stated that if a plaintiff satisfies the other three requirements,

> "'it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.'"

Otero Savings & Loan Ass'n v. Federal Reserve Bank, 665 F.2d 275, 278 (10th Cir. 1981)(quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)(other citations omitted)). Because the Court finds Williams has failed to satisfy the second factor–irreparable harm, the Court has not applied this more liberal definition and modified version of probability of success on the merits.

[4]This section provides that

> "[a]ny person who, on or in connection with any goods or services . . . , uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

15 U.S.C. § 1125(a)(1).

the DTPA, the key to proving a claim under the Lanham Act is proof of a likelihood of confusion. E.g., Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 527 (10th Cir. 1987).

Again, Williams has argued that the proximity of AHM's office coupled with AHM's use of the name "American Home Mortgage" has caused confusion in the public, and again, the Court has considered various factors in determinating whether a likelihood of confusion exists. Such factors include

(a) the degree of similarity between the trade names used by the parties, including the names' appearance and manner of display;

(b) the strength or weakness of Williams' trade name;

(c) AHM's intent in adopting the name "American Home Mortgage;"

(d) similarities and differences of the parties' services and marketing strategies;

(e) the degree of care likely to be exercised by clients seeking the services offered by Williams and AHM; and

(f) evidence of actual confusion, if any.

E.g., Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 554 (10th Cir. 1998).

"No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." Id. (emphasis deleted)(citation omitted). That is to say, "[s]ome . . . factors may prove more relevant that others, depending on the facts of each case[,] . . . [and some cases] may demand consideration of [other] factors . . . ." Id. (citation omitted).

In evaluating the degree of similarity between trade names, the Court must "consider the [trade names] . . . as they are encountered by the consumer in the marketplace and examine them on three levels: sight, sound, and meaning. Each [trade

name] . . . must be considered as a whole. Even if the trade names are similar, the likelihood of confusion is reduced if the two . . . , taken as a whole, are visually distinct." Id. (citations omitted).

In this connection, the Court finds although the trade name "American Home Mortgage" itself used by both Williams and AHM is identical, the difference in lettering on the respective offices and AHM's prominent use of the cubed logo and the Jenkinses' names with its trade name create a visual distinction when the names are encountered by clients.

A plaintiff asserting a claim under the Lanham Act must establish that its trade name is sufficiently distinctive to be worthy of protection. That is to say, the trade name to be protectible must be capable of identifying a particular business and distinguishing the services provided by that business from the services provided by another.

As indicated by the Court in connection with Williams' DTPA cause of action, the trade name "American Home Mortgage" is at most descriptive in terms of geography and the characteristics of the services provided. As such, it is considered relatively weak and not entitled to broad protection. Furthermore, as the Court has already stated, "American Home Mortgage" has not acquired a secondary meaning. In light of the multiple users of this phrase, it appears the public looks to the individual associated with the business and not the name of the company itself.

As to the intent of AHM in using the trade name, to the extent, if any, this factor is relevant, D. Williams speculated about the same, but produced no evidence that AHM adopted the trade name "American Home Mortgage" with "'the intent to derive benefit from . . . [Williams'] reputation or good will . . . .'" Universal Money Centers, Inc. v. American

Telephone & Telegraph Company, 22 F.3d 1527, 1532 (10th Cir. 1994)(quoting Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1485 (10th Cir. 1987)). Rather, the evidence instead indicated that AHM was relying upon the reputations of C. Jenkins and her husband.

In considering the parties' respective marketing strategies, the Court is mindful that "'[t]he greater the similarity between the products and services, the greater the likelihood of confusion' . . . [and] the greater degree of overlap in the marketing approaches of the two entities [in marketing similar products and services], the greater the likelihood of confusion." Heartsprings, Inc., 143 F.3d at 556 (quoting Universal Money Centers, 22 F.3d at 1532).

Both entities target clients seeking mortgage financing and both actively market their services through involvement in, and sponsorship of, community events and through advertisements in local publications. While the marketing methods and practices are similar, the actual advertisements used by Williams and AHM in the various publications differ greatly. Williams emphasizes its physical location; AHM emphasizes its personnel.

As to the degree of care exercised by third parties in selecting the services offered by either Williams or AHM, the Court finds such factor weighs in favor of the defendant. Although no evidence was presented regarding the care exercised by the public as a whole, there was evidence that those individuals in positions to refer customers needing financial assistance chose AHM, and more particularly, chose C. Jenkins, and not Williams or D. Williams.

Finally, the Court, in considering whether Williams has demonstrated a likelihood of success of the merits in connection with its Lanham Act cause of action, has examined

whether actual confusion exists in the marketplace. As the Court found with regard to Williams' DTPA cause of action, some confusion exists as evidenced by the misdirected deliveries, facsimile transmissions and telephone calls. However, "evidence of some actual confusion does not dictate a finding of likelihood of confusion." Universal Money Centers, 22 F.3d at 1525 (citation omitted).

As indicated, a movant must also show that it will suffer irreparable harm if the preliminary injunction does not issue. Preliminary proof of infringement and a high probability of confusion alone not only can constitute the irreparable injury required to warrant injunctive relief, but also may eliminate the necessity of proof of lost sales or other damages. However, again, "[d]elay in seeking relief . . . undercuts any presumption that infringement alone has caused irreparable harm . . . ." GTE Corporation v. Williams, 731 F.2d 676, 678 (10th Cir. 1984).

As the Court found in connection with Williams' request for a preliminary injunction under the DTPA, Williams has not acted with sufficient vigilance to warrant such extraordinary relief. Its failure to enforce its trade name against third-party users negates the need for immediate relief, and in any event, the Court finds Williams has not demonstrated that its business has been sufficiently impacted or financially impaired or that its good will or reputation in the community has been adversely affected by AHM's use of the trade name "American Home Mortgage."

"[G]uided by normal equitable principles and [after] . . . weigh[ing] the practicalities of the situation," id. (citation omitted), the Court finds Williams has failed to clearly and

unequivocally show its right to relief.[5]  Accordingly, the Court DENIES Williams' Motion for Temporary Injunction.

ENTERED this __13th__ day of June, 2005.

                                            LEE R. WEST
                                            UNITED STATES DISTRICT JUDGE

---

[5]Preliminary injunctions are designed primarily "to preserve the status quo pending a final determination of the parties' rights," Otero Savings & Loan, 665 F.2d at 277 (citation omitted), and preliminary injunctions that disturb the status quo are disfavored.